UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
WILLIAM R. MCCOLL,

                Plaintiff,

     – against –

ANDREW SAUL,[1] COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

-----------------------------------------------------------------x

**<u>MEMORANDUM & ORDER</u>**

18-CV-04376 (PKC)

PAMELA K. CHEN, United States District Judge:

     Plaintiff William R. McColl brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration's ("SSA") termination of his Disabled Adult Child Benefits ("CDB"). The parties have cross-moved for judgment on the pleadings. (Dkts. 9, 15.) Plaintiff seeks reversal of the Commissioner's decision, or alternatively, remand for further administrative proceedings. The Commissioner seeks affirmation of the decision to terminate benefits. For the reasons set forth below, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's motion. The case is remanded for further proceedings consistent with this Memorandum and Order.

## BACKGROUND

### I.    Procedural History

     Plaintiff was found disabled due to developmental delays and awarded CDB by a decision dated December 31, 1999, when Plaintiff was nineteen years old. (Administrative Transcript ("Tr."), Dkt. 6, 11.) Plaintiff's current diagnoses include intermittent explosive disorder and major

---

[1] Andrew Saul became Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul is substituted as Defendant in this action.

depressive disorder with psychosis. (*Id.* at 13.) Following a periodic evaluation to determine if Plaintiff remained disabled, including a psychological evaluation, the Commissioner advised Plaintiff by notice dated July 22, 2014 that his disability was found to have ceased as of that date. (*Id.* at 181–183.) Plaintiff requested a reconsideration of this decision by the Commissioner on August 20, 2014. (*Id.* at 185.) The Commissioner affirmed the finding that Plaintiff was no longer disabled by notice dated November 25, 2014 (*id.* at 193–205), and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on December 9, 2014 (*id.* at 206–07).

ALJ Ifeoma N. Iwuamadi first scheduled a hearing on January 17, 2017, which was continued to allow Plaintiff to appear with a representative. (*Id.* at 138–142.) On April 10, 2017, Plaintiff appeared with counsel at the rescheduled hearing and testified. (*Id.* at 143–176.) The ALJ found Plaintiff not disabled in a decision dated June 13, 2017. (*Id.* at 8–29.) Plaintiff requested a review of the decision by the Appeals Council on August 9, 2017 (*id.* at 319–324), which was denied on June 12, 2018 (*id.* at 1–7). This timely appeal followed.[2]

---

[2] Section 405(g) provides that

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g). "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the [plaintiff] makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)). Applying this standard, the Court determines that Plaintiff received the Commissioner's final decision on July 17, 2018. Plaintiff filed the instant action on August 2, 2018—16 days later. (*See generally* Complaint, Dkt. 1.)

## II. Relevant Facts and Medical History

On June 6, 1989, Plaintiff was referred to the Committee of Special Education at the age of eight. (Tr. at 361–65.) A July 5, 1989 psychological report indicated that Plaintiff had completed the third grade and that his IQ had been evaluated the previous year. (*Id.* at 367.) On November 8, 1995, when Plaintiff was fourteen years old, his mother filed a Petition for Person in Need of Supervision ("PINS petition") in Family Court after Plaintiff had run away from home, following misbehavior at home. (*Id.* at 440–41.) Soon after Plaintiff was enrolled in a residential program at the Diagnostic Reception Center in Abbot House. (Tr. at 442.) Following a Child Adolescent Service System Program meeting on July 16, 1997, Plaintiff was referred to Carbon-Monroe-Pike Mental Health for Forensic Assertive Community Treatment Services. (Tr. at 443–45.) The treatment plan noted that prior to his family's move to Pennsylvania, Plaintiff had been placed in a residential facility for a period of eighteen months, and while in placement, he had been charged with vandalism and theft, and incarcerated twice.[3] (*Id.* at 443.) During that placement, Plaintiff was diagnosed with depression and had self-mutilated; it was discovered that he had experienced auditory hallucinations; and the diagnostic impressions recorded were major depression with psychotic features and dependent personality. (*Id.*) Carbon-Monroe-Pike Mental Health evaluation updated his diagnoses to schizoaffective illness and anti-social personality characteristics. (Tr. at 453.)

In April 1999, Plaintiff was hospitalized. (*Id.* at 455.) The discharge instructions indicated that he was receiving medications, including Risperdal, Cogentin, and Prozac. (*Id.*) The Stroudsburg Area School District re-evaluated Plaintiff on October 4, 1999 (*id.* at 446), and

---

[3] The McColl family moved to Stroudsburg, Pennsylvania from New York City in April 1997. (Tr. 443.) By July 22, 2014, when the Commissioner determined that Plaintiff no longer qualified for CDB, Plaintiff was again living in New York City. (*See* Tr. at 482.)

recommended he continue in a small, structured environment with ample support, encouragement, and verbal prompts to remain on focus (*id.* at 451–52). Plaintiff was awarded CDB in December of that year. (*Id.* at 198.)

On November 17, 2008, when Plaintiff was 27 years old, Melissa Fogel, Ph.D., and Hope Klopchin, Ph.D., of AHRC Family and Clinical Services conducted a two-hour psychological evaluation ("VESID evaluation") for the purpose of determining whether Plaintiff qualified for services for people with developmental disabilities. (*Id.* at 476–81.) The psychologists noted that Plaintiff's "educational difficulties were evident since early childhood," and also noted numerous arrests. (*Id.* at 476–77.) They recorded that Plaintiff "attended individual psychotherapy weekly and was placed on Ritalin after he received a diagnosis of Attention Deficit Hyperactivity Disorder." (*Id.* at 477.) Following behavioral observations, a clinical interview, and administration of the Vineland-II Adaptive Behavior Scales and Wechsler Adult Intelligence Scale-Third Edition, the psychologists concluded that Plaintiff did not qualify for services for the developmentally disabled. (*Id.* at 477–78.) They summarized that

> [d]ue to the statistically significant difference between his Verbal and Performance IQ scores, the Full Scale IQ is not a reliable indicator of his overall intellectual functioning. [Plaintiff] is better described as functioning within the low average range verbally and within the average range in performance areas. [Plaintiff] does appear to have a learning disability in the verbal domain as well as in processing speed abilities[.]

(*Id.* at 478.) Drs. Fogel and Klopchin recommended that "[Plaintiff] would benefit from vocational training and individual psychotherapy . . . [and] a psychiatric evaluation, neuropsychological evaluation and education/achievement testing . . . to further assess his possible learning disability." (*Id.* at 478–79.)

On December 2, 2008, Plaintiff completed a two-hour comprehensive psychosocial evaluation with a licensed clinical social worker, Margalit Cooper. (*See generally id.* at 470–74.)

Ms. Cooper noted a history of "mental retardation; severity unspecified (per mother's report) prior to age 18," and a current unspecified mood disorder diagnosis. (*Id.* at 470.) Her diagnostic formulation was that:

> [Plaintiff] reports that he has had a history of mood swings during which time he experienced depressed mood and irritability. He reportedly used to cut himself and attempted suicide on three occasions. [Plaintiff] attempted to hang himself, but was found by his friend. . . . He was unable to expound on the second two attempts. [Plaintiff] relates that he used to experience auditory hallucinations which told him to "kill people." He reports that he has been prescribed Cogentin, Wellbutrin, Prozac[,] and Risperdal in the past. [Plaintiff] relates that he is no longer medicated and that he "feels great now." There is insufficient data to make a specific mood diagnosis at this time.

(*Id.* at 474.) During the mental status exam, Ms. Cooper noted Plaintiff's reported mood as "angry." (*Id.* at 472.) During a review of his educational history, she highlighted that Plaintiff reported that "he can read at the 'college level.' He reportedly has difficulty with comprehension however. He reports that he is able to write a simple note with few spelling errors. He is able to perform basic mathematical equations. . . . [Plaintiff] speaks in concrete sentences and his vocabulary appears adequate to communicate his needs." (*Id.* at 473–74.) Ms. Cooper then noted Plaintiff's "insight" as "fair." (*Id.* at 474.) During her assessment, Ms. Cooper described Plaintiff's activities of daily living ("ADLs"), stating that Plaintiff can dress himself, do his own laundry, "cook simple meals," is able to heat food up in the microwave, uses the phone, schedules his own medical appointments, is able to travel independently, has difficulty managing his finances, but can purchase simple items and does not have difficulty counting change. (*Id.* at 472.)

On June 27, 2014, Dr. John Laurence Miller conducted a consultative psychiatric evaluation. (*Id.* at 495–98.) Dr. Miller noted Plaintiff's diagnosis of intermittent explosive disorder and described much of the background previously recited. He found that Plaintiff experiences "[d]epressive symptoms includ[ing] social withdrawal. Anxiety related symptoms

includ[ing] irritability causing him to break things, curse and sometimes hurt people." (*Id.* at 496.)

Dr. Miller wrote that Plaintiff denied panic attacks, manic symptoms, and thought disorder

symptoms, but "has difficulty learning new material, specifically problem solving." (*Id.*) Plaintiff

also reported having been arrested over 100 times. (*Id.*) Most of Plaintiff's mental status

examination was not notable, except that his affect was "dysphoric," his mood "dysthymic," and

his insight and judgment only "fair." (*Id.* at 496–97.) Plaintiff also "has difficulty controlling his

temper." (*Id.* at 497.) Dr. Miller concluded that

> [Plaintiff] can follow and understand simple directions and instruction, perform
> simple tasks independently, maintain attention and concentration, maintain a
> regular schedule, learn new tasks and perform complex tasks independently. His
> ability to make appropriate decisions appears mildly limited. His ability to relate
> adequately with others and deal appropriately with stress appears to be moderately
> limited. Difficulties appear to be caused by psychiatric problems. The results of
> the examination appear to be consistent with psychiatric problems and this may
> significantly interfere with the [plaintiff]'s ability to function on a daily basis.

(*Id.* at 497.) Dr. Miller recommended "psychiatric intervention, vocational training and

rehabilitation. Prognosis is fair given that he receive[s] treatment." (*Id.* at 498.)

On July 17, 2014, a mental residual functional capacity assessment was completed by Dr.

R. Nobel, on behalf of the Commissioner. (*Id.* at 501.) It was determined that "[Plaintiff] no

longer carries any psychotic or major affective [diagnosis]. He has not had psych treatment in

about 15 years. Medical improvement has been dmonstrated [sic]." (*Id.* at 501.) The

Commissioner then deemed Plaintiff not disabled as of July 22, 2014 and discontinued his benefits.

(*Id.* at 11.)

On January 30, 2015, Plaintiff was evaluated by a medical professional and a case manager

at WeCARE.[4] (*Id.* at 503–32.) During the evaluation, Plaintiff stated that "at eleven years old[,]

---

[4] WeCARE is "a New York City Human Resources Administration public assistance
program designed to help low-income clients with medical and/or mental-health issues find

he was diagnosed with depression . . . [but] currently he doesn't receive services or take any medication for mental health issues"; "admitted trying to harm himself ([c]utting, hanging[,] and drowning)"; "admitted having thoughts of harming himself as recently as yesterday"; and "admitted hearing voices and hallucinating." (*Id.* at 507–08.) The intake physician, Dr. Hazra Rahim, noted Plaintiff's current symptoms as: "depressed mood. Denies having SI[5] yesterday; states he 'thought of death' but did not have a plan . . ." (Tr. at 518.) Plaintiff was referred for a specialist phase II exam in psychiatry.[6] *Id.* at 531.

Plaintiff began receiving regular psychiatric treatment at the Queens Consultation Center, LLC in November 2016. (*See id.* at 96.) He started weekly therapy sessions with social worker Reuben Jimenez, L.C.S.W., and psychiatric treatment and medication management with Dr. Bruce Schweiger. (*Id.* at 55–96, 565–72.) Plaintiff's treatment records from that facility span November 2016 to July 2017, and throughout that time he carried diagnoses of Adult ADHD, anger, major depressive disorder, and intermittent explosive disorder. (*See id.*) The treatment records further document an instance of agitated motor activity (*id.* at 89–90), periods of anxious or depressed mood (*id.* at 74, 75, 92, 95), and that Plaintiff "still feels depressed most of the time. He isolates himself a lot. [He] feels sad about his life" (*id.* at 569).

Dr. Schweiger submitted a "mental impairment questionnaire" dated December 28, 2016 to the Commissioner outlining the signs and symptoms that support Plaintiff's diagnoses and

---

employment and/or apply for disability benefits." *Arroyo v. Colvin*, 14-CV-3513 (PKC), 2016 WL 47871, at *2 (E.D.N.Y. Jan. 4, 2016).

[5] The Court assumes that SI indicated "suicidal ideation."

[6] It appears from the record that the phase II psychiatric report was only partially submitted into the record, as the report that is in the record is cut off mid-sentence and no functional capacity outcome is listed. (*Compare* Tr. 531–32, *with Arroyo*, 2016 WL 47871, at *3 (listing items normally included in a WeCARE evaluation).)

assessment: depressed mood; feelings of guilt or worthlessness; hostility or irritability; past suicide attempts; difficulty thinking or concentrating; easy distractibility; impulsive or damaging behavior; intense and unstable interpersonal relationships; and social withdrawal or isolation. (*Id.* at 549–53.) Dr. Schweiger accordingly found "marked" or "moderate-to-marked" limitations in the areas of understanding and memory, concentration and persistence, social interactions, and adaptation. (*Id.* at 552.) On August 17, 2017, Plaintiff's treating therapist, Mr. Jimenez, L.C.S.W., wrote a letter indicating that Plaintiff's "treatment includes weekly psychotherapy sessions and medication therapy. [Plaintiff] is responding well to his treatment regimen and is exhibiting progress. However, due to his condition[,] [Plaintiff] is unable to maintain employment at this time." (*Id.* at 96.)

Plaintiff was evaluated by psychiatrist Dr. Azariah Eshkenazi on January 26, 2017 for the purpose of "ascertain[ing] whether or not [Plaintiff] is able to be gainfully employed. (*Id.* at 554.) Dr. Eshkenazi reviewed Plaintiff's medical history and noted that Plaintiff "still hears [auditory hallucinations], but he heard them last, approximately three months ago. At times, he stated, it is the voice of [a] man telling him to hurt himself, and at other times, it is the voice of a woman. He stated that the women's voices usually tell him [to] hurt other people . . . ." (*Id.* at 555.) "Questioned about how he spends his days, [Plaintiff] stated that he has a dog and a cat, and he takes care of them. Most of the time, he stated, he sleeps. At times, he tries to do some workout exercises." (*Id.* at 556.) With respect to his social life, "[Plaintiff] stated that he only knows two or three people, but he does not socialize much with them." (*Id.*) In response to questions about his ability to be employed, Plaintiff "stated that when he is near people, he becomes very irritable, angry, hostile, and aggressive. When he attempted to work, in the past, he lost his jobs very quickly

because he could not interact with people." (*Id.*) Dr. Eshkenazi's mental status evaluation concluded:

> This is a 36 year old, slim, black man, who appears totally detached. His general appearance is that of severe depression. [Plaintiff] is oriented as to time, place and person. His speech is soft but coherent. His thought processes are responsive. His memory, recent and remote; fair, at best. His affect is constricted. His mood is one of severe depression. He talks about auditory hallucinations, hearing the voices of men and women. At present, he denies active suicidal ideation, but he often experiences those feelings.

(*Id.*) Dr. Eshkenazi stated that Plaintiff "is not able to be gainfully employed nor is his condition expected to improve in the foreseeable future." (*Id.*) On April 26, 2017, Dr. Eshkenazi submitted an addendum to his report indicating that Plaintiff's lack of treatment "certainly does not indicate that he was not mentally ill. Many people with mental illness refuse to accept that fact and refuse to go for treatment. The fact remains that [Plaintiff] was still mentally ill and was unable to be gainfully employed, during the period when he did not go for treatment." (*Id.* at 563.) Dr. Eshkanzi reaffirmed Plaintiff's diagnoses of major depressive disorder with psychosis and intermittent personality disorder, noting that these are "lifelong conditions," and "he will need treatment for the rest of his life." (*Id.*)

## III.    THE ALJ DECISION

On June 13, 2017 the ALJ issued a decision determining that Plaintiff's disability ended on July 22, 2014, and that he had not become disabled again as of that date. (*Id.* at 11, 24.) The decision followed the eight-step evaluation process established to determine whether an individual is no longer disabled. The ALJ found that the "comparison point decision," or the most favorable medical decision finding that Plaintiff was disabled, occurred on December 31, 1999, and at that time Plaintiff had a developmental delay that met the functional equivalent childhood listing of 20 C.F.R. Pt. 404, Subpt. P, App. 1 (20 C.F.R. § 404.1520(d)). (*Id.* at 13.) The ALJ noted that the

"exact basis of the allowance is not clear from the record" as Plaintiff's "paper file was "destroyed and then reconstructed." (*Id.*)[7]

The ALJ determined that through the date of the decision, Plaintiff had not engaged in substantial gainful activity under 20 C.F.R. § 404.1594(f)(1), and that as of July 22, 2014, Plaintiff "had the following medically determinable impairments: intermittent explosive disorder and major depressive disorder with psychosis." (*Id.*) However, the ALJ decided that since July 22, 2014, Plaintiff has not had an impairment or combination of impairments which met or equaled the severity of a mental impairment listed in the regulations. (*Id.*) In making that determination, the ALJ considered whether Plaintiff met the "paragraph B" criteria of Listing 12.04, including whether that impairment resulted in at least one extreme or two marked limitations in each of four broad areas of functioning, *i.e.*, the ability to "[1] [u]nderstand, remember, or apply information; [2] interact with others; [3] concentrate, persist, or maintain pace; and [4] adapt and manage oneself." (*Id.*); *see* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(A)(2)(b).) The ALJ found that Plaintiff had only mild limitation with respect to understanding, remembering, or applying information. (*Id.*) With respect to this finding, the ALJ relied on (1) 2008 IQ testing showing low average range and average range; (2) Plaintiff's self-reporting of some problems with comprehension, as offset by Plaintiff's ability to read at the college level, write simple sentences, perform basic mathematical equations, and his self-report of having no problems with memory or following instructions; (3) the evaluator's observation that "the [plaintiff] speaks in sentences and has vocabulary adequate to communicate his needs;"[8] (4) the absence of mental health treatment

---

[7] Given that Plaintiff's paper file was destroyed, it is unclear whether CDB was initially granted to Plaintiff on the basis of developmental disabilities alone, or in conjunction with diagnosed psychiatric disabilities.

[8] The ALJ cites to the "VESID evaluation" conducted by a social worker in December 2008, discussed further *supra*.

for over two years until November 2016; and (5) Plaintiff's self-reports of engaging in "significant activities of daily living," such as living alone, purchasing items from a store on his own, caring for pets, cleaning, doing laundry, playing basketball and video games, watching movies, and making music in a studio. (*Id.* at 13–14.)

To reach her decision, the ALJ considered: (1) Plaintiff's testimony; (2) the testimony of Plaintiff's mother; (3) the testimony of Plaintiff's neighbor, who "described two interactions she had with [him] and described the [Plaintiff] as "'child-like'" (*id.* at 22); (4) medical reports from Plaintiff's treating psychiatrist, Dr. Bruce Schweiger; (5) a medical report prepared by Plaintiff's consulting psychiatrist, Dr. Eshkenazi; (6) the FedCap WeCARE report; (7) the VESID evaluation; and (8) Dr. Miller's consultative psychiatric evaluation of Plaintiff. (*Id.* at 17–19.)

The ALJ describes Plaintiff's testimony as follows:

> [T]he [Plaintiff] testified to being arrested over 100 times in his life and arrested once since 2014. He reported hearing voices since he was a child and that it comes and goes. He reported having problems with people on the street and that he feels that people look at him weird. He reported feeling like people are talking down to him or yelling and this makes him want to fight. He reported having arguments with his mother. He reported jumping out of a moving car. He reported being incarcerated in the last 15 years and that he was separated from the general population because he wanted to fight. He reported only socializing with his parents and staying home with his pets. He reported no longer making music. He reported not taking public transportation because he will flip out if someone rubs him the wrong way. He reported feeling depressed, hating everything, and sad all the time. He reported thinking about suicide sometimes. He reported difficulty with memory. He reported that his mother goes to appointments with him and speaks for him. He reported that his mother pays bills and shops for him because he overspends. He reported that medication does not help.

(*Id.* at 17.) The ALJ did not find Plaintiff wholly credible, because while his "medically determinable impairment could have reasonably been expected to produce the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the objective medical and other evidence." (Tr. at 18.) The ALJ further

noted that "[a]side from the conservative and very recent outpatient treatment, the record indicates some one-time evaluations for various purposes . . . [that] generally indicate inconsistencies in reporting of symptoms and that despite various complaints, objective findings were fairly limited." (*Id.*)

Additionally, the ALJ afforded "little weight" to the medical evidence from the WeCARE evaluation, "little weight" to the evidence submitted by Plaintiff's treating psychiatrist, Dr. Schweiger, "little weight" to the psychiatric evaluation submitted by Dr. Eshkenazi, "some weight" to the consultative examination by Dr. Miller, and "some weight" to the state agency consultant Dr. Nobel, who did not evaluate Plaintiff. (*Id.* at 21–22.) The ALJ did not afford significant weight to any of the medical evidence, nor was the evidence from Plaintiff's treating therapist referenced in the ALJ decision. (*See id.*)

## STANDARD OF REVIEW

An individual may bring an action in federal district court seeking judicial review of the Commissioner's decision following any final decision reached by the Commissioner after a hearing to which he was a party. 42 U.S.C. § 405(g). In reviewing a final decision, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and internal quotation marks omitted)). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory

12

evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks and citations omitted). However, "it is up to the [SSA], and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

## DISCUSSION

For the reasons set forth below, the Court reverses the ALJ decision and remands for further proceedings. The Court finds that the ALJ erred by incorrectly weighing the medical evidence and that the ALJ's credibility determination as to Plaintiff is not supported by substantial evidence in the record. In addition, while not a basis of the remand ordered here, the Court further finds that the ALJ improperly shifted the burden of proof from the Commissioner to Plaintiff on the issue of whether Plaintiff has experienced a medical improvement that warrants the termination of CDB. The Court includes its analysis of this issue to provide guidance for the ALJ on remand.

## I.      Eligibility Standard for Disabled Adult Child Benefits

The Social Security Act provides CDB for a person who can prove "that [he] is a disabled adult whose parent was entitled to Social Security retirement benefits and that [he] may receive Social Security childhood disability benefits because [he] has been continuously disabled since before the age of 22 and was dependent on [his] parent." *Bronzene v. Astrue*, No. 10-CV-00967 (MAD), 2012 WL 602142, at *11 (N.D.N.Y. Feb. 23, 2012) (citing 42 U.S.C. § 402(d)(1)(B)); *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1182 (D.C. Cir. 2008) (same); *see also* 20 C.F.R. § 404.350(a)(5). "In the context of determining eligibility for [CDB], the term 'disability' has substantially the same definition as it does in traditional, adult disability cases." *Doerr v.*

*Colvin*, No. 13-CV-429 (JTC), 2014 WL 4057446, at *3 (W.D.N.Y. Aug. 14, 2014). Thus, plaintiffs establish disability status by demonstrating an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also 42 U.S.C. § 1382c(a)(3). The statute further requires a determination that the individual's "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner is obligated to periodically review whether a disabled child continues to be eligible for CDB, *see* 42 U.S.C. § 1382c(a)(3)(H)(ii)(I), and may terminate the payment of benefits "on the basis of a finding that the physical or mental impairment on the basis of which such benefits have been granted either has ceased, does not exist, or is no longer disabling . . . ." 42 U.S.C. § 423(f). This finding must be supported by substantial evidence demonstrating that there has been medical improvement in the individual's impairment or combination of impairments (other than medical improvement that is not related to the individual's ability to work), and the individual is now able to engage in substantial gainful activity, 42 U.S.C. § 423 (f)(1), and follows an eight-step evaluation of the plaintiff's ongoing disability, *see* 42 U.S.C. § 423(f); *see generally* 20 C.F.R. § 404.1594. Medical improvement is defined as

> any decrease in the medical severity of [the Plaintiff's] impairment(s) which was present at the time of the most recent favorable medical decision that [the plaintiff was] disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs, or laboratory findings associated with [the plaintiff's] impairment(s).

20 C.F.R. § 416.994(b)(1)(i).

The first two steps of this evaluation determine whether the plaintiff is currently engaging in substantial gainful activity and, if not, whether he has a medically sufficient impairment or combination of impairments. 20 C.F.R. § 404.1594(f)(1)–(2). The third step requires a determination as to whether medical improvement has occurred, 20 C.F.R. § 404.1594(f)(3), and, if so, whether that improvement is related to the plaintiff's ability to work, 20 C.F.R. § 404.1594(f)(4). If there has been no medical improvement then the Commissioner must determine whether an exception to medical improvement applies. 20 C.F.R. § 404.1594(f)(5). If medical improvement is shown and related to the plaintiff's ability to work, or if there is an applicable exception, then it is determined whether the plaintiff's current impairments are severe and, if so, whether the plaintiff

has the capacity to perform his or her past relevant work or other work in the national economy. 20 C.F.R. § 404.1594(f)(6)–(8).

This standard calls for a comparative analysis and only permits the Commissioner to terminate benefits "upon substantial evidence that the individual's condition has improved to the point that he or she is no longer disabled, or that the initial finding of disability was erroneous." *De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984) (cited approvingly in *Hathaway v. Berryhill*, 687 F. App'x 81, 83 (2d Cir. 2017) (summary order)). The Commissioner may not "simply disregard a prior finding that a particular medical condition is disabling" as the prior finding of disability entitles the plaintiff to a "presumption that as long as there is no change in the condition itself, or in the governing statutes or regulations, neither will the statutory classification of disability be changed." *Id.* at 937 (collecting extra-jurisdictional Circuit Court cases). This standard ensures that benefits are not discontinued "simply on the whim of a changed ALJ." *Id.* (citation omitted).

## II. The ALJ's Weighing of Medical Opinion Evidence

The Court finds that the ALJ failed to properly weigh the medical opinion evidence and failed to provide appropriate deference to the medical opinion of Plaintiff's treating physician. "With respect to the nature and severity of a [plaintiff]'s impairments, the SSA recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the [plaintiff]." [9] *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks, brackets, and citations omitted). "The opinion of a treating physician on the nature or severity of a [plaintiff]'s impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (noting that treating physicians offer a "unique perspective to the medical evidence" that cannot otherwise be obtained from the record)) (citing *Burgess*, 537 F.3d at 128; 20 C.F.R. § 404.1527(c)(2)) (additional citation omitted)). While an ALJ is entitled to disregard the opinion of a [plaintiff]'s treating physician—after giving the physician the opportunity to correct the deficiencies in his or her medical reports—the ALJ must make clear that this decision is based on conclusions made by a medical professional and not those made by the ALJ himself or herself. *See Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("The ALJ is not permitted to substitute [her] own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion."); *Hillsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly

---

[9] Although "[t]he current version of the [Social Security Act]'s regulations eliminates the treating physician rule," the rule nevertheless applies to Plaintiff's appeal, as the Commissioner's determination was dated July 22, 2014, and the current regulations only "apply to cases filed on or after March 27, 2017." *Burkard v. Comm'r of Soc. Sec.*, No. 17-CV-290, 2018 WL 3630120, at *3 n.2 (W.D.N.Y. July 31, 2018); 20 C.F.R. § 404.1520(c).

substituted his own opinion for that of a physician, and has committed legal error.").  As the Second

Circuit explained:

> An ALJ who refuses to accord controlling weight to the medical opinion of a
> treating physician must consider various factors to determine how much weight to
> give to the opinion.  Among those factors are: (i) the frequency of examination and
> the length, nature and extent of the treatment relationship; (ii) the evidence in
> support of the treating physician's opinion; (iii) the consistency of the opinion with
> the record as a whole; (iv) whether the opinion is from a specialist; and (v) other
> factors brought to the [SSA's] attention that tend to support or contradict the
> opinion.  The regulations also specify that the Commissioner will always give good
> reasons in her notice of determination or decision for the weight she gives
> [plaintiff]'s treating source's opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citations and internal quotation marks

omitted).

Here, the ALJ afforded "little weight" to the opinion of Plaintiff's treating psychiatrist, Dr.

Bruce Schweiger, and did not even mention Plaintiff's treating therapist.  (Tr. at 21–22.)  With

respect to Dr. Schweiger, the ALJ reasoned that

> Dr. Schweiger only saw the [Plaintiff] twice.  His opinion is not consistent with the
> overall record as described above indicating no treatment for many years until very
> recently and very significant and varied activities of daily living in the meantime.
> Other exams in the record also indicate fairly limited objective findings.  The
> opinion is not supported by Dr. Schweiger's subsequent treatment notes through
> April 2017, which generally indicate normal exams.  The [Plaintiff]'s mother also
> testified that medication is helpful.

(*Id.* at 21 (internal citations omitted)).

This reasoning, however, overlooks or minimizes the fact that: (1) Dr. Schweiger's

treatment of Plaintiff spanned from December 2016 to July 2017 (*id.* at 547–53; 566–72); (2) Dr.

Schweiger's initial findings, as reported in the mental impairment questionnaire he submitted in

December 2016 to the Commissioner, confirmed Plaintiff's diagnoses of, *inter alia*, depressed

mood; hostility or irritability; difficulty thinking or concentrating; easy distractibility; impulsive

or damaging behavior; intense and unstable interpersonal relationships; and social withdrawal or

isolation (*id.* at 550); (3) Dr. Schweiger found in December 2016 that Plaintiff suffered from "marked" or "moderate-to-marked" limitations in the areas of understanding and memory, concentration and persistence, social interactions, and adaptation (*id.* at 552); and (4) Dr. Schweiger's findings in December 2016 were consistent with Plaintiff's adolescent psychiatric history as described above, and Plaintiff's concurrent therapist treatment records, which noted agitated motor activity (*id.* at 89, 90) and an anxious or depressed mood (*id.* at 92, 95, 74, 75). Although Dr. Schweiger's subsequent notes may have generally indicated a normal mental status as one aspect of the evaluation, these limited observations do not necessarily indicate an absence of disability. (*See, e.g.*, *id.* at 569 ("[Plaintiff] still feels depressed most of the time. He isolates himself a lot. [He] feels sad about his life").) In fact, in August 2017, Plaintiff's treating therapist specifically opined that, even after almost a year-and-a-half of weekly psychotherapy sessions and medication therapy, "due to [Plaintiff's] condition, [he] is unable to maintain employment at this time." (*Id.* at 96.)

The ALJ further discredited Dr. Schweiger's findings because Plaintiff's "mother also testified that medication is helpful." (*Id.* at 21.) However, the ALJ fails to explain how the helpfulness of medication impacts the weight of the psychiatrist's opinion or the extent of Plaintiff's disability. Nevertheless, the opinion of a "lay person, is entitled to but limited weight," especially when allegedly contradicting that of a medical expert. *Cf. Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983) (abrogated on other grounds).

Moreover, to the extent that the ALJ believed that Plaintiff's treating psychiatrist's report was contradictory or inconclusive, she should have solicited additional medical information. As courts in this Circuit have held, "the ALJ must make every reasonable effort to help an applicant get medical reports from [her] medical sources" and "must seek additional evidence or clarification

when the report from the [plaintiff]'s medical source . . . does not contain all the necessary information[.]" *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (internal quotation marks and alterations omitted); *Demera v. Astrue*, No. 12-CV-432 (FB), 2013 WL 391006, at *2 (E.D.N.Y. Jan. 24, 2013) (finding the ALJ must seek additional evidence or clarification when the plaintiff's medical reports contain conflicts or ambiguities, if the reports do not contain all necessary information, or if the reports lack medically acceptable clinic and laboratory diagnostic techniques); *Mantovani v. Astrue*, No. 09-CV-3957 (RRM), 2011 WL 1304148, at *3 (E.D.N.Y. Mar. 31, 2011) (same as *Demera*); *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–0909 (2d Cir. 2009) (holding ALJ has affirmative obligation to develop the administrative record)*; Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 83 (2d Cir. 2009) (holding same as *Lamay* in case involving termination of benefits). "This rule applies even where the plaintiff was represented by counsel at the hearing." *Vazquez v. Comm'r of Soc. Sec.*, No. 14-CV-6900 (JCF), 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999)). This is especially vital when developing the record with respect to a treating physician's opinion "[b]ecause of the considerable weight ordinarily accorded to the opinions of treating physicians." *Rocchio v. Astrue*, No. 08—CV-3796 (JSR) (FM), 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19, 2010), *report and recommendation adopted*, No. 08-CV-3796 (JSR), 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011) (citation omitted). Therefore, while a "treating physician's statement that the [plaintiff] is disabled cannot itself be determinative[,] . . . failure to develop conflicting medical evidence from a treating physician is legal error requiring remand." *Id.* (citations omitted and alterations in the original); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). Moreover, "the ALJ is responsible for developing a full and complete record between the time that elapses between plaintiff's application and plaintiff's hearing date." *Scott v. Astrue*,

No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *14 n.60 (E.D.N.Y. July 9, 2010) (citation omitted).

Here, there was, in fact, other medical evidence in the record that supported Dr. Schweiger's initial opinion regarding Plaintiff's mental health impairments, as well as the August 2017 assessment of Plaintiff's treating therapist. Yet, the ALJ gave these consultative opinions little weight as well. For example, the ALJ afforded "little weight" to the medical opinion of consulting psychiatrist Dr. Eshkenazi, emphasizing that he "only saw the [plaintiff] once and the evaluation appears to have been at the recommendation of the [plaintiff]'s representative. [Dr. Eshkenazi] indicated reviewing some records, but it is also unclear which records [he] reviewed. [His] opinion is not consistent with the overall record for many of the same reasons as stated above for Dr. Schweiger." (Tr. at 21.) The ALJ also took issue with Dr. Eshkenazi's statement that failure to seek treatment does not mean that a person is not mentally ill. (*Id.*) The ALJ found

> [t]he opinion . . . inconsistent with the overall record. The [plaintiff]'s mother testified that the [plaintiff] refused to go for treatment. However, even in the absence of treatment for many years, the record indicates that the [plaintiff] had [engaged in] significant activities of daily living. The [plaintiff] also did not have any decompensations requiring any type of treatment: outpatient, emergency, or otherwise. Aside from Dr. Eshkenazi's generalized statement that "many people" refuse treatment, the record does not objectively document that refusal to attend treatment is an inherent part of the [plaintiff]'s illness.

(*Id.* (internal citations omitted).)

It was improper for the ALJ to discredit Dr. Eshkenazi's medical opinion based on Plaintiff's refusal or failure to seek treatment for a mental illness. Although generally decided in the context of a plaintiff challenging a credibility determination, it is well established that a court "faulting a person with diagnosed mental illnesses . . . for failing to pursue mental health treatment is a questionable practice." *Simpson v. Colvin*, 15-CV-06244 (EAW), 2016 WL 4491628, at *15 (W.D.N.Y. Aug. 25, 2016); *see also id.* (noting that in *McGregor v. Astrue*, 993

F. Supp. 2d 130, 143 (N.D.N.Y. 2012), the credibility determination was improper where it was based in part on mentally ill plaintiff's failure to seek mental health treatment). Likewise, the Commissioner's own regulations provide that

> [an] adjudicator must not draw inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

S.S.R. 96-7p, 1996 WL 374186, at *7 (July 2, 1996). Furthermore, by discrediting Dr. Eshkenazi's view of Plaintiff's failure to seek or get treatment in assessing the nature and/or extent of Plaintiff's mental health impairments, the ALJ improperly substituted her own medical opinion for that of the medical expert. *Greek*, 802 F.3d at 375 ("The ALJ is not permitted to substitute [her] own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion.").

Moreover, the ALJ's assessment of Dr. Eshkenazi's opinion as inconsistent with Plaintiff's ADLs, without any explanation as to how those ADLs qualify Plaintiff for employment, does not adhere to the Commissioner's regulations that recognize that individuals with psychiatric disabilities may appear to adequately function in a restricted setting, but still may be unable to meet the demands of a competitive workplace environment. *See, e.g.*, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (C)(3) ("[The Commissioner] must exercise great care in reaching conclusions about [the Plaintiff's] ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on [the plaintiff's] ability to complete tasks in other settings that are less demanding, highly structured or more supportive."); SSR 85–15, 1985 WL 56857, at *6 (Jan. 1, 1985) ("[T]he reaction to the demands of work (stress) is highly

individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. . . . Thus, the mentally ill may have difficulty meeting the requirements of so-called 'low-stress' jobs."); *see also Moss v. Colvin*, No. 13-CV-00731 (GHW) (MHD), 2014 WL 4631884, at *33 (S.D.N.Y. Sept. 16, 2014) ("There are critical differences between activities of daily living (which one can do at his own pace when he is able) and keeping a full time job.").

By contrast, the ALJ found that the consultative psychiatric evaluation submitted by psychologist Dr. Miller and the opinion of the Commissioner's reviewing consultant, "Dr. R. Nobel," were entitled to "some weight" because they were more consistent with the treatment record. (Tr. at 22; *see also id.* at 501.) However, Dr. Miller's evaluation of Plaintiff lasted "at the most, five minutes" (*id.* at 168–69), which, at a minimum, violated the SSA's regulation requiring a psychological examination by a consultative examiner to last at least sixty minutes and a psychiatric evaluation to last at least forty minutes. *See* 20 C.F.R. § 404.1519n(a)(3)–(4). Dr. Nobel did not even meet with Plaintiff, and, as the ALJ noted, "[t]he only evidence available for [Dr. Nobel] to review at the time was the consultative examination [of Dr. Miller], which was generally normal and also supplied a detailed description of [ADLs]." (Tr. at 22.) Given these facts, it is hard to understand the ALJ's decision to afford the treating physicians' opinions "little weight," in part, due to their limited interactions with Plaintiff, while affording "some weight" to the consultative examiners' opinions, which were rendered after such limited—indeed, patently and woefully deficient—evaluations.

Furthermore, Dr. Miller's and Dr. Noble's evaluations in June and July 2014, respectively, were conducted *two years before* Plaintiff began seeing Dr. Schweiger and *three years before* Dr.

Eshkenazi's evaluation of Plaintiff. Again, it is hard to understand how the ALJ could find that a consultative examiner's opinion that predated the opinions of the treating physician and another consultative examiner by several years should be given more weight than the more recent opinions of Plaintiff's treating medical professionals. The ALJ, however, failed to provide any explanation with respect to these issues relating to her weighing of the medical opinions.

In any event, even assuming *arguendo* that the ALJ was entitled to rely on Dr. Miller's June 2014 evaluation, his opinion does not support the ALJ's finding that Plaintiff ceased to be disabled as of that date. Despite finding that Plaintiff had only mild and moderate limitations with respect to certain job-related skills, Dr. Miller concluded, "[t]he results of the examination appear to be consistent with psychiatric problems and this may *significantly* interfere with the [Plaintiff's] ability to function on a daily basis." (Tr. at 497 (emphasis added).) Dr. Miller further noted that Plaintiff's "[d]epressive symptoms include[d] social withdrawal." (*Id.* at 496.) Moreover, Dr. Miller explained that Plaintiff's "[a]nxiety related symptoms include[d] irritability causing him to break things, curse[,] and sometimes hurt people," that Plaintiff "ha[d] difficulty learning new material, specifically problem solving" (*id.* at 497), and that he "ha[d] difficulty controlling his temper" (*id.*). Consequently, Dr. Miller recommended that Plaintiff receive "psychiatric intervention, vocational training and rehabilitation[,]" and stated that Plaintiff's "[p]rognosis [was] fair given that he receive[s] treatment." (*Id.* at 498.) The record does not indicate that Plaintiff sought or received treatment thereafter until December 2016, when he started seeing Dr. Schweiger, his treating psychiatrist. And, as previously discussed, the record further indicates that, notwithstanding approximately eighteen months of psychotherapy and psychiatric treatment starting in November 2016, Plaintiff was, in the opinion of his treating therapist, still "unable to maintain employment." (*Id.* at 96.) Thus, even factoring in Dr. Miller's consultative assessment,

the substantial evidence does not support the ALJ's determination that Plaintiff's disability ended on July 22, 2014, and if anything, tends to support the conclusion that Plaintiff continued to be disabled through at least January 26, 2017, when he was last evaluated by a medical professional, Dr. Eshkenazi, who opined that Plaintiff "is not able to be gainfully employed nor is his condition expected to improve in the foreseeable future." (*Id.* at 556.)

Accordingly, the Court finds that the ALJ's decisions regarding the weight to be accorded to the opinions of Plaintiff's treating medical professionals and the consultative examiners were not supported by substantial evidence and thus constitute error requiring remand.

### III.    The ALJ's Assessment of Plaintiff's Credibility

Plaintiff's second argument is that the ALJ's determination that Plaintiff's statements were not credible is not based on substantial evidence. The Court agrees.

SSA regulations obligate an ALJ "to take the [plaintiff]'s reports of pain and other limitations into account, [but the ALJ] is not required to accept the [plaintiff]'s subjective complaints without question." *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (summary order)(alterations omitted) (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)) (internal quotation marks and alterations omitted). "The ALJ will consider all of the available medical evidence, including a [plaintiff]'s statements, treating physician's reports, and other medical professional reports." *Fontanarosa v. Colvin*, No. 13-CV-03285 (MKB), 2014 WL 4273321, at *12 (citing *Whipple v. Astrue*, 479 F. App'x 367, 370–71 (2d Cir. 2012) (summary order)). "To the extent that a [plaintiff]'s allegations of [a symptom] 'are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry.'" *Id.* (quoting *Meadors v. Astrue*, 370 F. App'x 179, 184 (2d Cir. 2010) (summary order) (citing 20 C.F.R. § 404.1529(c)(3)(i)–(vii))). "Credibility determinations . . . must contain specific reasons for the finding on credibility,

supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Atwater v. Astrue*, No. 10-CV-420 (WMS), 2012 WL 28265, at *6 (W.D.N.Y. Jan. 5, 2012) (internal quotation marks and citation omitted), *aff'd*, 512 F. App'x 67 (2d Cir. 2013) (summary order).

Here, the ALJ found that Plaintiff's "medically determinable impairment could have reasonably been expected to produce the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the objective medical and other evidence." (Tr. at 18.) The ALJ further noted that "[a]side from the conservative and very recent outpatient treatment, the record indicates some one-time evaluations for various purposes . . . [that] generally indicate inconsistencies in reporting of symptoms and that despite various complaints, objective findings were fairly limited." (*Id.*)

Although the ALJ set out specific findings as to Plaintiff's credibility in the decision (*see generally* Tr. at 18–20), those reasons were not supported by the evidence in the record. For example, the ALJ highlighted

> [t]he [plaintiff] alleged hearing voices and that it comes and goes, but the record shows inconsistent reports of this symptom. The [plaintiff] also did not report it to his recent treating psychiatrist. The [plaintiff]'s mother testified that for all these years, she never noticed that the [plaintiff] was hearing voices until he told her recently. Exams in the record generally indicate normal thought processes and do not document the [plaintiff] reacting to internal stimuli.

(Tr. at 20.)

The Court finds that inconsistencies with respect to Plaintiff's reporting, or the occurrence, of hallucinations does not provide a basis for discrediting his testimony regarding his symptoms. First, the fact that Plaintiff did not experience hallucinations on a constant or predictable basis (*see, e.g.*, Tr. at 548 (Dr. Schweiger noting in November 2016 that Plaintiff denied hallucinations,

but also reported "hear[ing] voices in the past telling him to hurt[ ]himself") certainly does not undermine the credibility of his reports about experiencing hallucinations. *Cf. Susan-Kealoha C. v. Berryhill*, 18-CV-00515 (NAM), 2019 WL 2743587, at *8 (N.D.N.Y. June 28, 2019) ("Notably, a person with mental illness may have good days and bad days."); *Patrick v. Comm'r of Soc. Sec.*, 17-CV-0896 (WMS), 2019 WL 2482185, at *5 (W.D.N.Y. June 14, 2019) (citing *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) ("Cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a [plaintiff] is capable of working.")). Second, given the erratic nature of Plaintiff's hallucinations, the Court does not find that Plaintiff's inconsistent reports about them provides a basis for completely discrediting his testimony that he suffers from occasional hallucinations.

The ALJ also underscored that Plaintiff inconsistently reported suicidal ideation. For instance, the ALJ wrote that, "[o]n January 30, 2015, the [plaintiff] had an evaluation at FedCap WeCARE. With the intake interviewer, the [plaintiff] reported suicidal ideation as recent as yesterday. However, with the physician, the [plaintiff] denied suicidal ideation yesterday. He reported that he 'thought of death' but did not have a plan." (Tr. at 19 (internal citations omitted).) The Court does not find these reports to be inconsistent.

The Court also agrees with Plaintiff's arguments that his ability to engage in certain ADLs—which he testified about at the hearing—does not undermine the credibility of his testimony about his psychiatric symptoms, for the reasons discussed *supra*. (*See* Plaintiff's Brief, Dkt. 10, at 23–28.) Furthermore, it was improper for the ALJ to selectively credit Plaintiff's testimony about his ADLs while rejecting his testimony about his psychiatric symptoms, without

medical or other record evidence justifying the difference in treatment, which does not exist here. In fact, the medical evidence in the record, discussed *supra*, contradicts the ALJ's conclusion that Plaintiff's "[e]xams in the record generally indicate normal thought processes and do not document the [plaintiff] reacting to internal stimuli." (Tr. at 20.)

In sum, the Court finds that the ALJ's credibility determination regarding Plaintiff's testimony as to his symptoms was not supported by substantial evidence.[10]

## IV. Burden of Proof

Finally, the Court finds that the ALJ erred in shifting the burden of proof from the SSA to Plaintiff to show that he continued to be disabled as of July 22, 2014.[11] While this error arguably cannot serve as a ground for remand in this case because Plaintiff failed to raise it in his motion,[12]

---

[10] While the Court agrees with Plaintiff's argument that the ALJ "grossly mischaracterized the record" in finding Plaintiff not credible (Plaintiff's Brief, Dkt. 10, at 13), because the Court finds that remand is warranted based on various grounds, as discussed in this Memorandum and Order, the Court does not address all of the instances cited by Plaintiff.

[11] This error ordinarily would require reversal and remand to the SSA. *See Selian*, 708 F.3d at 417 (finding reversal necessary where ALJ's decision was not "based on a correct legal standard") (quoting *Talavera*, 697 F.3d at 151)).

[12] Although the Second Circuit has not yet ruled on this question, a number of district courts in this Circuit have found that failure to raise an issue before the ALJ waives that issue's review by the District Court. *See, e.g.*, *Guzman v. Berryhill*, 15-CV-3920 (VB) (LMS), 2019 WL 3387319, at *22 (S.D.N.Y. June 12, 2018); *Carvey v. Astrue*, No. 06-CV-0737 (NAM) (DEP), 2009 WL 3199215, *14 (N.D.N.Y. Sep. 30, 2009) ("The failure to present an argument to the ALJ constitutes waiver of the right to raise it on appeal."); *Williams v. Astrue*, No. 07–CV–4134 (JGK), 2008 WL 4755348, at *12 (rejecting the plaintiff's argument that her "depressed mood was an independent severe impairment" where "plaintiff did not argue to the ALJ that this condition was a sufficient additional impairment"); *Harvey v. Astrue*, No. 05-CV-1094 (NAM), 2008 WL 4517809, *15 (N.D.N.Y. Sept. 29, 2008) (noting that because "[p]laintiff's counsel did not challenge the basis for the vocational expert's testimony and failed to raise any objection to the conduct of the ALJ until now . . . the objections are forfeited"); *Harrison v. Colvin*, No. 13-CV-835 (FJS) (CFH), 2014 WL 4794406, at *10 (N.D.N.Y. Sept. 25, 2014) (citing *Fernandez*, 1998 WL 603151, at *16) ("It would be unfair to the Commissioner for the Court now to review an issue which Fernandez could have raised on administrative appeal, but which she did not, either because of oversight or for tactical reasons.").

the Court nonetheless analyzes this issue so as to provide guidance to the ALJ regarding the proper burden to apply on remand.

The burden of proof to establish that a plaintiff has experienced a medical improvement supporting a termination of benefits lies with the Commissioner.  In a non-precedential order, the Second Circuit recently considered an appeal from a plaintiff who had received CDB based on an intellectual disability.  *Adelman v. Berryhill*, 742 F. App'x 566, 567 (2d Cir. 2018) (summary order).  Although the substance of the appeal centered on the resolution of overpayments, the Second Circuit's ruling hinged on the applicable burden of proof following a termination of benefits.  *Id.* at 574–75.  Specifically, the panel in *Adelman* concluded

> that the relevant SSA regulation supports [the plaintiff's] view as to the burden of proof:  that regulation provides that "[i]n most instances, *we* must show that you are able to engage in substantial gainful activity before your benefits are stopped."  20 C.F.R. § 404.1594(b)(5) (emphasis added); *see also id.* c 404.1594(a) ("Even where medical improvement related to your ability to work has occurred or an exception applies, in most cases . . . *we must also show* that you are currently able to engage in substantial gainful activity before we can find that you are no longer disabled." (emphasis added)); *id.* c 404.1594(d) ("If one of these exceptions applies, *we must also show* that, taking all your current impairment(s) into account, not just those that existed at the time of our most recent favorable medical decision, you are now able to engage in substantial gainful activity before your disability can be found to have ended." (emphasis added)); *De Leon*, 734 F.2d [at 936] (quoting 42 U.S.C. § 425(a) for the proposition that "[t]he Secretary is authorized to terminate a [plaintiff]'s disability benefits whenever [*he*] *obtains* evidence that a [plaintiff]'s disability has 'ceased'" (emphasis added)).  That regulation does not indicate what the exceptions to its rule might be, and the Commissioner has not given us any reason to think that this is one such circumstance.

*Id.* (emphasis in the original).[13]

---

[13] The Second Circuit's recent summary order is primarily consistent with how other circuit courts and district courts place the burden of proof during a hearing following a termination of Social Security benefits.  *See Kennedy v. Astrue,* 247 F. App'x 761, 764–65 (6th Cir. 2007); *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002) ("Under the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled." (citing 42 U.S.C. § 423(f))); *Glenn v. Shalala*, 21 F.3d 983, 987 (10th Cir. 1994) ("[B]efore termination of benefits, the Secretary has the burden of showing that a [plaintiff] has

Here, the ALJ, in describing the applicable law and the eight-step analysis, wrote that "[a]lthough the plaintiff generally continues to have the burden of proving disability at [the eighth] step, a limited burden of going forward with the evidence shifts to the Social Security Administration." (Tr. at 12.)  It is clear from this language and the ALJ's substantive discussion (*see generally* Tr. at 12–23), that she improperly placed the burden of proof on Plaintiff, rather than on the SSA.  Although the ALJ's decision preceded *Adelman*, and the ALJ did not have the benefit of the Second Circuit's reasoning, the burden of proof was still improperly applied, and contributed to the ALJ's improper weighing of the medical opinion evidence.  Thus, on remand, the ALJ should place the burden on the Commissioner to show that Plaintiff experienced sufficient

---

the ability to engage in substantial gainful activity."); *Murray v. Heckler*, 722 F.2d 499, 500 (9th Cir. 1983) ("[O]nce a [plaintiff] has been found disabled, he or she is entitled to a presumption that the disability still exists.  The Secretary then has the burden to come forward with evidence of improvement.") (internal citations omitted); *Lesley v. Berryhill*, 261 F. Supp. 3d 983, 988 (D. Ariz. 2017) ("To revoke benefits, the Commissioner bears the burden of establishing that a [plaintiff] has experienced medical improvement that would allow him to engage in substantial gainful activity." (quotation marks omitted)); *Carter v. Colvin*, 27 F. Supp. 3d 1142, 1147 (D. Colo. 2014) ("The Commissioner bears the burden of demonstrating that the [plaintiff] has experienced medical improvement such that she now can engage in substantial gainful activity."). *But cf. Preece v. Shalala*, No. 91-CV-56127, 1994 WL 38601 (Table), at *1 (9th Cir. 1994) (summary opinion) ("Once a [plaintiff] is found disabled, a presumption of continuing disability arises.  Although the [plaintiff] retains the burden of proof, this presumption shifts the burden of production to the Secretary to produce evidence to meet or rebut the presumption." (internal quotation marks and citations omitted)); *Diaz v. Berryhill*, 388 F. Supp. 3d 382, 392 (M.D. Pa. 2019) ("[W]hen we are evaluating the Commissioner's determination that someone who was once found to be disabled no longer suffers from a continuing disability, we do so under a paradigm which includes shifting burdens of production and proof.  In assessing continuing disability claims, the plaintiff bears some initial burden of production and persuasion. . . .  Once the burden to come forward has shifted to the Secretary, the Secretary must present evidence that there has been sufficient improvement in the [plaintiff]'s condition to allow the plaintiff to undertake gainful activity or show that the initial disability determination was made in error." (internal quotation marks and alterations omitted) (quoting *Kuzmin v. Schweiker*, 714 F.2d 1233, 1238 (3d Cir. 1983); *Keegan v. Heckler*, 744 F.2d 972, 975 (3d Cir. 1984)).

medical improvement as of July 22, 2014 to find that his disability had ceased by that date and he was no longer entitled to CDB.[14]

## CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this Order. The Clerk of Court is respectfully requested to enter judgment and close this case.


SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 27, 2019
      Brooklyn, New York

---

[14] The ALJ, however, did have the benefit of Plaintiff's argument regarding the burden of proof at the hearing. (Tr. at 147.)